# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3588

U.S.O. CORPORATION,

*Plaintiff-Appellant*,

*v.*

MIZUHO HOLDING COMPANY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 459—**Joan Humphrey Lefkow**, *Judge*.

ARGUED SEPTEMBER 3, 2008—DECIDED OCTOBER 28, 2008

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity suit, in federal court under 28 U.S.C. § 1332(d)(2)(C), charges conversion by affiliated Japanese entities that we'll refer to collectively as "the bank." The district judge dismissed the suit on the basis of the doctrine of *forum non conveniens*. That venerable judge-made doctrine, securely a part of federal common law, authorizes a court to dismiss a suit if making the defendant defend in that

court rather than in an alternative forum would burden the defendant unreasonably. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507-09 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248-51 (1981) ("dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice"); *In re Factor VIII or IX Concentrate Blood Products Litigation*, 484 F.3d 951 (7th Cir. 2007); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 717-19 (7th Cir. 2002); *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 950 (1st Cir. 1991).

The plaintiff, although incorporated in Delaware, is the wholly owned subsidiary of a Japanese company, and its headquarters are in Japan. It invested in a limited partnership also created under Delaware law; and as with the plaintiff the partnership's principal place of business was in Japan, and all its partners had Japanese addresses. The partnership invested in another limited partnership, which bought a building in Chicago. The suit charges the bank with having misappropriated $6.95 million from the plaintiff's bank account in Japan after the building was sold, that being the plaintiff's share of the proceeds from the sale. The suit also charges the bank with having skimmed an unspecified percentage of the annual return to which the plaintiff's investment entitled it before the bank was sold, and by doing so of having reduced that return to $500,000 in each of the ten years of the plaintiff's indirect investment in the building.

Most of the alleged bad acts were committed in Japan by Japanese persons and almost all the witnesses and documents are there; and eight months after this suit was filed the bank brought a mirror-image declaratory judgment suit in a Japanese court. That litigation is proceeding, the Japanese court having denied the plaintiff's motion to dismiss the suit because of the pendency of the present suit.

There is no reason for identical suits to be proceeding in different courts in different countries thousands of miles apart. Such parallel proceedings incite a race to judgment in the hope that the judgment in the home forum will favor the home litigant and be usable to block the other suit by interposing a defense of res judicata in it. Oddly, none of the lawyers in this case seems to know much about Japanese law; they have been unable to tell us what if any weight the Japanese court would give a final judgment in the present suit should it end first. But Japan does have a doctrine of res judicata, and though narrower than ours it would bar an identical suit provided the judgment pleaded in bar was a judgment on the merits. Yasuhiro Fujita, 5 *Doing Business in Japan*, Part XIV, § 5.04 (2008); J. Mark Ramseyer & Minoru Nakazato, *Japanese Law: An Economic Approach* 144-45 (1999); Kevin M. Clermont, "A Global Law of Jurisdiction and Judgments: Views from the United States and Japan," 37 *Cornell Int'l L.J.* 1, 11-12 (2004); Shiro Kawashima & Susumu Sakurai, "Shareholder Derivative Litigation in Japan: Law, Practice, and Suggested Reforms," 33 *Stanford J. Int'l L.* 9, 52-54 (1997).

One device for avoiding duplicate lawsuits is the doctrine of abstention articulated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818 (1976). It has sometimes been applied when identical concurrent litigation is, as in this case, pending abroad. See, e.g., *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898-901 (7th Cir. 1999); *Ingersoll Milling Machine Co. v. Granger*, 833 F.2d 680, 685-86 (7th Cir. 1987); *Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93-94 (2d Cir. 2006); Louise Ellen Teitz, "Both Sides of the Coin: A Decade of Parallel Proceedings and Enforcement of Foreign Judgments in Transnational Litigation," 10 *Roger Williams U. L. Rev.* 1, 18-21 (2004). But as far as we know abstention has not been urged in either suit by any party to the present suit.

The bank has made a compelling case for the dismissal of this suit on the ground of *forum non conveniens*. Dragging all those witnesses and documents from Japan to Chicago, supplying interpreters for the witnesses and translators for the documents, and conducting a trial largely on the basis of testimony given through interpreters and of documents translated from their original language, would impose unreasonable burdens not only on the defendants but also on the district court. Moreover, the law applicable to the issues in the case is almost certainly Japanese law, with which American judges have little familiarity. In fact, as we said, even the lawyers in this case, though their clients are Japanese firms, have little familiarity with Japanese law. And besides, the litigation in Japan is well advanced and the Japanese court has declined to abate it in favor of the U.S. litigation.

The plaintiff argues that there is a strong presumption in favor of a plaintiff's choice of forum, especially if the plaintiff is an American and the forum is an American court. In a veritable paroxysm of formalism the plaintiff's lawyers refuse to acknowledge that their client is "American" in only the most artificial sense, since it has no American presence except a Delaware certificate of incorporation. It had an indirect investment in an American building, but foreigners own a large chunk of the American economy without being thought Americans; by the end of 2006 foreign direct investment in the United States had reached $1.8 trillion. James K. Jackson, "CRS Report for Congress: Foreign Investment and National Security: Economic Considerations," June 27, 2008, p. 1, www.fas.org/sgp/crs/natsec/RL34561.pdf (visited Oct. 3, 2008); see also U.S. Dept. of State, "Foreign Direct Investment," www.state.gov/r/pa/prs/ps/2006/63553.htm, Mar. 22, 2006 (visited Oct. 3, 2008).

The plaintiff says that to look through the corporate form to the nationality of the plaintiff's managers and shareholders is to pierce the corporate veil without an adequate showing of undercapitalization, misrepresentation, neglect of corporate formalities, etc. That is nonsense. The purpose of the veil is to shield shareholders from personal liability for the corporation's debts in order to encourage investment; no one is trying to reach the personal assets of the plaintiff's shareholders.

Insisting (and with a straight face) on the Americanness of their foreign client, the plaintiff's lawyers argue that the presumption in favor of the plaintiff's choice of

forum is nationalistic; it is about the right not of plaintiffs in general but of *American* plaintiffs to sue foreigners in *American* courts. Putting to one side for the moment that the plaintiff is not really "American," one can find language supportive of the nationalistic interpretation in some court of appeals decisions. In *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004), for example, we read that courts "should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country." (To the same effect, see, e.g., *Adelson v. Hananel*, 510 F.3d 43, 53 (1st Cir. 2007); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1395 n. 7 (8th Cir. 1991).) But *SME Racks* was merely repeating language found in a 1955 case called *Burt v. Isthmus Development Co.*, 218 F.2d 353, 357 (5th Cir. 1955), and such language does not sort well with the Supreme Court's statement (made long after *Burt*) in that "citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Piper Aircraft Co. v. Reyno*, *supra*, 454 U.S. at 255 n. 23.

A foreign company that chooses to sue in the United States rather than in its own country is unlikely to experience inconvenience if the court invokes *forum non conveniens* against it. Realistically a Japanese company, our

plaintiff should not be disconcerted to have to litigate against its Japanese adversaries in a Japanese court. "[I]f the plaintiff is suing far from home, it is less reasonable to assume that the forum is a convenient one . . . . [T]he risk that the chosen forum really has little connection to the litigation is greater." *In re Factor VIII or IX Concentrate Blood Products Litigation*, *supra*, 484 F.3d at 956. The plaintiff's home is Tokyo, which is quite a distance from Chicago.

Explaining why "citizens or residents deserve somewhat more deference than foreign plaintiffs" the Court in *Piper* pointed out that "when the home forum has been chosen, it is reasonable to assume that this choice is convenient." 454 U.S. at 235 n. 23. Convenience—the "central purpose" of *forum non conveniens*, *id*. at 256—is not a euphemism for nationalism or protectionism. The demands of a global economy require that American courts be amenable to permitting litigation that can be handled much more efficiently in foreign forums to be sent to those forums. "International business transactions depend on evenhanded application of legal rules; hometown favoritism is the enemy of commerce*." Intec USA, LLC v. Engle*, 467 F.3d 1038, 1040 (7th Cir. 2006); see also *Pacific Employers Ins. Co. v. M/V Captain W.D. Cargill*, 751 F.2d 801, 805 (5th Cir. 1985). And so American plaintiffs may find themselves told to litigate in a foreign forum under an even-handed and pragmatic application of *forum non conveniens*.

Courts need to look behind an assertion that the plaintiff is "American," moreover, to determine whether the

party has the sort of ties with the United States that make the American judicial forum convenient. The plaintiff's lawyers contend that the Japanese character of the nominally American plaintiff cannot be a consideration in deciding whether the presumption has been overcome; only the respective litigation burdens of the parties in one forum versus the other may be considered. This contradicts the plaintiff's "Americanism" argument, and is anyway wrong. The more tenuous a party's relation to the forum, the weaker its case for litigating there. The fact that a Japanese company has a Delaware corporate certificate but no offices or personnel in Chicago or for that matter anywhere else in the United States should not make it feel more at home litigating in Chicago than in Tokyo. The plaintiff keeps calling itself an "Illinois company," but it is not. It is an out-of-state corporation that had an indirect investment in a building located in Illinois. The Supreme Court has said that the presumption in favor of the plaintiff's choice of forum is diminished when it is not its home forum. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, *supra*, 549 U.S. at 430.

We do not question the presumption in favor of a plaintiff's choice of forum. Rules governing subject-matter jurisdiction, personal jurisdiction, venue, and removal (the defendants removed the plaintiff's suit, originally filed in an Illinois state court, to the federal district court in Chicago) limit a plaintiff's choice of forum, as do provisions for change of venue and for consolidating multidistrict litigation for pretrial proceedings. 28 U.S.C. §§ 1404, 1407. And the rules for allocating burdens of proof usually make the plaintiff's case harder to prove than

the defendant's. The limits on personal jurisdiction are particularly important, as they often force a plaintiff to litigate on the defendant's home turf. And dismissal may have more serious consequences for a plaintiff, even if he can refile his suit elsewhere, than merely being transferred to another district court within the federal system—for the elsewhere is almost always a court in a foreign country. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, *supra*, 549 U.S. at 430. That is why the showing required to prove that the *forum* is indeed *non conveniens* is greater than that required for obtaining a change of venue from one district court to another. *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955); *Piper Aircraft Co. v. Reyno*, *supra*, 454 U.S. at 253-54; *In re Joint Eastern & Southern Districts Asbestos Litigation*, 22 F.3d 755, 762 (7th Cir. 1994); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986); 17 *Moore's Federal Practice* § 111.74[3][a], p. 111-227 (3d ed. 2008). Finally, it would complicate and prolong litigation if the plaintiff's choice of forum were just the starting point for the selection of the forum in which the case would actually be litigated. So the presumption is fine, but it is not to be treated, as the plaintiff would have us do, as a nigh-insurmountable obstacle to dismissal.

The plaintiff argues that its principal evidence, at least of its profit-skimming claim, is in the United States, consisting on the documentary side of the partnership agreements and on the witness side of accountants who will try to reconstruct the profits from the investment in the building. But the plaintiff is trying to make the tail wag the dog. The amount of money at stake in the

profit-skimming claim appears to be tiny. Suppose the bank had skimmed 5 percent of the proceeds of the building investment. Then the total loss to the plaintiff would be only \$263,157.90 ([\$500,000 ÷ .95 × 10] × .05), for remember that the plaintiff received \$500,000 a year for 10 years). That is equal to only 3.8 percent of the amount of money allegedly converted from the plaintiff's bank account. The amount skimmed *could* exceed \$263,157.90, but the plaintiff's inability after years of litigation to offer even a ballpark estimate of its profit-skimming loss is suspicious, as is its failure to have sought an accounting of the building's finances. If the plaintiff really has no idea what its loss was, we cannot understand why it expects to be presenting at considerable expense a parade of witnesses and slew of documents in the district court should the case be tried here and why that uncertain expectation should be a reason for conducting the entire litigation in Chicago.

An argument made by the plaintiff that is related to the preceding one is that the limited scope of discovery allowed by Japanese courts will make it impossible to obtain justice in the Japanese litigation. The relation lies in the plaintiff's contention that the limitations of discovery will be felt most acutely with respect to the profit-skimming claim.

The argument reflects a misunderstanding of the difference between a common law system, such as that of the United States, and a civil law system, such as that of Japan. In the former, the burden of investigation falls on the parties' lawyers, and discovery procedures are designed

to facilitate party investigation. In the latter, the burden of investigation falls on the judges, and the role of the lawyers is correspondingly diminished. *United States v. Filani*, 74 F.3d 378, 383 (2d Cir. 1996); Federal Judicial Center, *A Primer on the Civil-Law System* 37 (1995); Carl F. Goodman, "The Evolving Law of Document Production in Japanese Civil Procedure: Context, Culture, and Community," 33 *Brooklyn J. Int'l L.* 125, 128 (2007); Koichi Miki, "Roles of Judges and Attorneys Under the Non-Sanction Scheme in Japanese Civil Procedure," 27 *Hastings Int'l & Comparative L. Rev.* 31, 41-42 (2003); Geoffrey C. Hazard, Jr., "Discovery and the Role of the Judge in Civil Law Jurisdictions," 73 *Notre Dame L. Rev.* 1017, 1019-22 (1998); John H. Langbein, "The German Advantage in Civil Procedure," 52 *U. Chi. L. Rev.* 823 (1985).

As far as we are able to determine, it is six of one, half-dozen of the other; for the investigatory powers of judges in a civil law system are great. Mary Ann Glendon, Paolo G. Carozza & Colin B. Picker, *Comparative Legal Traditions: Text, Materials and Cases on Western Law* 185 (3d ed. 2007); Howard M. Erichson, "Mass Tort Litigation and Inquisitorial Justice," 87 *Georgetown L.J.* 1983, 2006-07 (1999); Robert G. Bone, "Statistical Adjudication: Rights, Justice, and Utility in a World of Process Scarcity," 46 *Vand. L. Rev.* 561, 629 n. 208 (1993). As Ramseyer and Nakazato, *supra*, at 141-42, explain, "Although American critics frequently point to the absence of discovery in Japan, the point is a red herring. For its absence follows straightforwardly from the use of discontinuous trials. In the United States, the need to try facts before a specially impaneled jury forces lawyers to concentrate prepara-

tion into a discrete pretrial phase. Discovery is merely its name. In Japan, the trial itself blends the American trial equivalent with the American discovery equivalent. Granted, even between court hearings Japanese lawyers cannot conduct the indiscriminate and largely unsupervised fishing expeditions that characterize some American discovery. Instead, to obtain evidence they generally must convince the judge to order others to testify or to produce documents (though recent changes in the Japanese Civil Procedure Code allow parties a bit more independence than before) . . . . Critically Japanese judges do have the power they need to make the disclosure process work. If a judge finds a request for information valid, he can order the opposing party to comply. Should the party refuse, depending on the issue he can fine him, throw him in jail, or find the disputed fact in the other party's favor. Should a third party refuse to comply with an order to testify or produce documents, he can, again, fine him or throw him in jail."

The plaintiff has given us no reason to suppose that Japanese procedures are inadequate to enable it to prove its profit-skimming claim. It tells us, moreover, that it does not intend to file that claim as a counterclaim in the Japanese litigation; this strengthens the inference that the claim is a makeweight, injected into the present suit for strategic reasons.

Thus far we have considered, with the partial exception of choice of law, considerations relating to the balance of convenience to the parties. The Supreme Court has told us also to consider how the public interest might be affected by the choice of forum:

Factors of public interest also have place in applying the doctrine [of *forum non conveniens*]. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Gulf Oil Corp. v. Gilbert, supra*, 330 U.S. at 508-09; see also *Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). These considerations point as strongly to Japan as the proper forum for resolving the parties' dispute as the private-interest considerations do, except that we have no information about congestion in the Japanese court in Tokyo where the mirror-image litigation is pending. That uncertainty to one side, the local interest is that of Japan; to burden Americans with jury duty to resolve an intramural Japanese dispute would be gratuitous; and a Japanese court is more at home with Japanese law and Japanese firms than an American court would be. This last point bears on the public interest as well as the private interest in the choice of forum because "judges

have an interest independent of party preference for not being asked to decide an issue that they cannot resolve intelligently." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006).

The "public interest" is open-ended. There may be cases in which it will weigh heavily in favor of conducting international litigation in a U.S. rather than a foreign court, for example cases involving concerns of national security in either the strategic or the economic sense of that term, *Agudas Chasidei Chabad v. Russian Federation*, 466 F. Supp. 2d 6, 29-30 (D.D.C. 2006), or in which compliance with an important U.S. regulatory scheme could not be assured in a foreign forum. See *Doe v. Hyland Therapeutics Division*, 807 F. Supp. 1117, 1128-30 (S.D.N.Y. 1992); C*arlenstolpe v. Merck & Co.*, 638 F. Supp. 901, 908-09 (S.D.N.Y. 1986); Note, "Cross-Jurisdictional Forum Non Conveniens Preclusion," 121 *Harv. L. Rev.* 2178, 2198 (2008). This is not such a case.

AFFIRMED.