# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1504, 08-2146

CARLOS ABAD, *et al.*, on their own behalf and
    that of others similarly situated,

*Plaintiffs-Appellants*,

*v.*

BAYER CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
MDL No. 986 JFG, No. 93 C 7452—**John F. Grady**, *Judge*.

No. 08-3101

CARLOS MIGUEL PASTOR, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BRIDGESTONE/FIRESTONE
    NORTH AMERICAN TIRE, LLC, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 04 C 5812—**Sarah Evans Barker**, *Judge*.

ARGUED APRIL 1, 2009—DECIDED MAY 1, 2009

Before POSNER, EVANS, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*.   We have consolidated for decision two appeals (*Abad* and *Pastor*) that present similar issues concerning the doctrine of *forum non conveniens* ("inappropriate forum"). The doctrine allows a court to dismiss a suit if there are strong reasons for believing it should be litigated in the courts of another, normally a foreign, jurisdiction. E.g., *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429-30 (2007); *In re Factor VIII or IX Concentrate Blood Products Litigation*, 484 F.3d 951, 954-56 (7th Cir. 2007). In both our cases the plaintiffs are Argentine citizens, resident in Argentina, who filed products-liability suits in federal district courts against American manufacturers under the diversity (technically, the alienage, 28 U.S.C. § 1332(d)(2)(B)) jurisdiction for injuries sustained in Argentina. In each case the district judge, on the defendants' motion, after considerable pretrial discovery, invoked *forum non conveniens* and dismissed the case in favor of the courts of Argentina. *In re Factor VIII or IX Concentrate Blood Products Litigation*, 531 F. Supp. 2d 957 (N.D. Ill. 2008); *In re Bridgestone/ Firestone, Inc. Tires Products Liability Litigation*, No. 04 C 5812 (S.D. Ind. Jan. 31, 2007). The plaintiffs have appealed; dismissal of a case on grounds of *forum non conveniens* is deemed a final judgment appealable under 28 U.S.C. § 1291 even though it does not end the litigation. *Mañez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578, 583-84 (7th Cir. 2008).

The plaintiffs press on us language, from a leading case that deals with the related doctrine of abstention in

favor of a parallel proceeding in another court, about the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Conservation District v. United States*, 424 U.S. 800, 817 (1976). The defendants counterpunch with the well-supported assertion that a ruling granting a motion to dismiss on the basis of *forum non conveniens* can properly be reversed only if the judge in granting the motion was guilty of an abuse of discretion. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981); *In re Factor VIII or IX Concentrate Blood Products Litigation*, *supra*, 484 F.3d at 954, 956; *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996). That is a deferential standard of appellate review, designed for cases in which the first-level decision-maker is asked to apply a general standard that requires him to balance a number of competing considerations. As long as the judge doesn't commit a demonstrable factual error, or an error of law, his decision is unlikely to be reversed. There are two reasons. It is difficult to pin error on a judgment based on a comparison of imponderables, as is the character of most standards. And the main responsibility of appellate courts—to declare and elaborate principles of law and police compliance with those principles by the first-level decision-makers—is not engaged in reviewing a decision that involves weighing the unique circumstances of a particular case rather than creating or articulating a legal rule or principle. These are "case-specific rulings, which, even if they do not compose a consistent pattern across similar cases (the possibility inherent in deferential appellate review—deference implying that the appellate

court might well have affirmed an opposite ruling by the district court), do not unsettle the law because the rulings set forth no general propositions of law." *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 308 (7th Cir. 2002).

The plaintiffs do not deny that abuse of discretion is the applicable principle of appellate review in *forum non conveniens* cases but they say that the judge's thumb has to be on one side of the scale—that he must deny the motion to dismiss unless the balance of relevant factors inclines very steeply in favor of dismissal, because of the presumption that we mentioned (the "unflagging obligation") in favor of giving the plaintiff his choice of courts. This is provided of course that there is subject-matter and personal jurisdiction, and venue, in the court in which the plaintiff has sued, but these conditions are satisfied in this case. Indeed, the plaintiffs argue that an Argentine court would not exercise jurisdiction over a case that had initially been filed in a foreign country, but this appears not to be true, see, e.g., *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1282-83 (11th Cir. 2001), and if, contrary to what we believe, it should turn out to be true, the plaintiffs could resume suit in the United States. The judge in *Pastor* explicitly conditioned dismissal on the right to resume the suit in her court if the Argentine courts refuse to exercise jurisdiction. The judge in *Abad* did not, but achieved the same result by stating that the dismissal was without prejudice and hence does not have res judicata effect.

The plaintiffs are right that there is a presumption in favor of allowing a plaintiff his choice of courts rather

than insisting that he choose the optimal forum, as we explained in *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 752-53 (7th Cir. 2008), though it is not so powerful a presumption as they think. A case should not be lightly shifted from one court to another, forcing the plaintiff to start over, especially when the rules of personal jurisdiction often force a plaintiff to litigate on the defendant's home turf. Yet in the two cases before us the plaintiffs could have sued—all concede—in their own nation's courts, the courts of Argentina, where the defendants would have been in the uncomfortable position of being giant American corporations accused of killing and injuring citizens of Argentina. (Or so one might think; but of course the defendants *want* to be in the Argentine, not the American, courts.)

We are not saying that the plaintiffs *should* have sued in Argentina. They were entitled to sue these American corporations in American courts. They say they are entitled to *all* the litigation rights of an American citizen because of a treaty between the United States and Argentina which says just that. Treaty of Friendship, Commerce and Navigation Between Argentina and the United States, July 27, 1853, Art. VIII, 10 Stat. 1005. Even without the treaty, we would agree that a foreign plaintiff has the same rights in an American court as an American citizen has, see *In re Factor VIII or IX Concentrate Blood Products Litigation*, *supra*, 484 F.3d at 956—discrimination against foreign litigants should be unthinkable in this cosmopolitan age of commercial globalization. It should make no difference that the plaintiffs are Argentines rather than Alaskans. But a suit by our plaintiffs in Illinois or a suit

in Florida (where the *Pastor* suit was originally filed) would be a case of a "plaintiff [who] is suing far from home," and in such a case "it is less reasonable to assume that the forum [chosen by the plaintiff] is a convenient one" and therefore the presumption in favor of allowing the plaintiff to stay in the court of his choice is weakened. *Id.*; see *Piper Aircraft Co. v. Reyno*, *supra*, 454 U.S. at 266; *Iragorri v. United Technology Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc).

The district judge in *Pastor* said that she was applying a "neutral" rule of *forum non conveniens*, implying, the plaintiffs argue, that she failed to apply the presumption in favor of their choice to sue in the United States. But when the judge's statement is read in context, it is apparent that all she meant was that since the plaintiffs were foreign, relegating them to litigate in the courts of their home country would not impose on them as great a hardship as when a ruling of *forum non conveniens* would eject the plaintiff from his home court and send him to the defendant's home court in another country. When the plaintiff wants to sue on the defendant's home turf, and the defendant wants to be sued on the plaintiff's home turf, all really that the court is left to weigh is the relative advantages and disadvantages of the alternative forums. In such a case there is no reason to place a thumb on the scale, since there is no prima facie reason to think a plaintiff discriminated against by being sent to his home court or a defendant discriminated against by being forced to stay and defend in *his* home court.

One can find strong language about the plaintiff's right to his chosen forum in many judicial opinions, such as

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), but they usually are referring to an American plaintiff wanting to litigate in an American rather than foreign court, that is, to a plaintiff who has sued in his home court and wants to stay there. Moreover, while "in times past, a dismissal for forum non conveniens was a relatively infrequent occurrence . . . , the tremendous growth in international commerce, travel, and interdependence since World War II has increased the number and variety of cases in which a foreign court would be a more convenient forum." 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3828, p. 623 (3d ed. 2007).

It is especially odd for the plaintiffs in the *Pastor* case to describe the courts of Argentina as "foreign," and to quote as if in support of their position the statement in *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 346 (8th Cir. 1983) (emphasis added), that "the fact that the defendants are located in this country is one indication that it would be less burdensome for the defendants to defend suit in this country than it would be for [the plaintiff] to litigate *in a foreign country*." To Argentines, Argentina is not a foreign country. The implication of the plaintiffs' argument is that if they were opposing in an Argentine court a motion to dismiss on grounds of *forum non conveniens* filed by an American defendant, they would lose because the treaty we cited had turned them into Americans!

When application of the doctrine would send the plaintiffs to their home court, the presumption in favor of

giving plaintiffs their choice of court is little more than a tie breaker. And so our focus in these cases must be on particularized circumstances that lean in favor of U.S. courts or foreign courts. For guidance judges often turn to a multifactor test for applying *forum non conveniens* that the Supreme Court laid down more than sixty years ago, in *Gulf Oil Corp. v. Gilbert*, *supra*, 330 U.S. at 508-09. American law has long been hospitable to multifactor tests—maybe too hospitable. *Menard, Inc. v. Commissioner*, 2009 WL 595587, at *2 (7th Cir. Mar. 10, 2009); *Sullivan v. William A. Randolph, Inc.*, 504 F.3d 665, 671 (7th Cir. 2007); *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1394 (7th Cir. 1990); *United States v. Borer*, 412 F.3d 987, 992 (8th Cir. 2005). The factors that the *Gulf Oil* opinion deemed relevant to whether to dismiss a suit on the basis of *forum non conveniens* form quite a laundry list:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy . . . . Administrative difficulties follow for courts when litigation is piled up in con-

gested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

The Court prefaced the list with the rather alarming statement that "it has not been attempted to catalogue the circumstances which will justify or require either grant or denial of remedy. The doctrine leaves much to the discretion of the court to which plaintiff resorts." 330 U.S. at 508. Thus, long as it is, the list is incomplete. That gives a party free rein to suggest *any* reason that occurs to him for why the case should be litigated in one court rather than another. But because there *is* a list, and a list sponsored by the Supreme Court, albeit in a case more than half a century old, parties find it difficult to resist trying to make their case correspond to the items in the list, however violent a dislocation of reality results. And so the plaintiffs in our two cases argue that the United States has a greater interest in the litigation than Argentina because the defendants are American companies, while the defendants argue that Argentina has a greater interest than

the United States because the plaintiffs are Argentines. The reality is that neither country appears to have any interest in having the litigation tried in its courts rather than in the courts of the other country; certainly no one in the government of either country has expressed to us a desire to have these lawsuits litigated in its courts. For this is ordinary private tort litigation that "implicates," as some judges like to say, no national interest. So rather than proceed down the list we shall simply consider whether the district judge in either case was unreasonable in deciding that, given the circumstances of each case, the remaining litigation should be conducted in Argentina rather than in Illinois or Florida.

*Abad* is a class action on behalf of some 600 Argentines, but a class action that, along with class actions by groups of citizens from other foreign countries, was carved out of a much larger, long-running class action. In these actions, hemophiliacs claim that they (or their decedents) were infected with the AIDS virus because the defendant manufacturers of the clotting factor that hemophiliacs take to minimize bleeding failed to eliminate (as they could have done) the virus from donors' blood from which the clotting factor was made. The class members had acquired and used and become infected by the defendants' blood solids in Argentina.

By virtue of a ruling by the district court that neither side questions, the defendants' motion to dismiss the suit on grounds of *forum non conveniens* was deferred until the completion of the plaintiffs' pretrial discovery. The remaining discovery will have to be conducted in Argentina because that is where the members of the class are

located—some of whom, at least, the defendants would like to depose, along with obtaining their medical records. The plaintiffs point out that the depositions and documents obtained in the discovery they've conducted of the defendants will have to be translated into Spanish if the suit is litigated there. But by the same token the depositions and documents obtained in the defendants' discovery in Argentina would have to be translated into English were the case tried in Chicago.

The plaintiffs point out that their database of discovery materials in Chicago contains 12 million documents, whereas the discovery in Argentina would, they say, be limited to their medical reports. But obviously the plaintiffs are not going to submit 12 million documents to an Argentine, or any other, court; and since the class has some 600 members, deposing them and collecting medical records and other documentary materials relating to their injuries and damages and translating all these materials from Spanish to English would be a formidable undertaking too. Had the plaintiffs presented a realistic estimate of the quantity of discovery materials in English that would be submitted to the Argentine court, and of the cost of translating them into Spanish, we would give the estimate substantial weight. They have not done so, and, in the absence of any actual evidence of relative burdens, costs of translation must be considered a wash.

The plaintiffs argue that under Argentine choice of law rules the substantive law that would be applied if this case were litigated in an Argentine court would be American rather than Argentine law. If true, this would be a powerful argument for leaving the case in Chicago. But as

near as we can determine, it is false, though certainty eludes us because of a dearth of cases or other legal materials from Argentina that bear on the question.

In most U.S. jurisdictions, even those that use a "most significant relationship" test to resolve conflict of laws issues in tort suits, there is a practical presumption that the law of the place where the tort occurred ("*lex loci delicti*") governs the substantive questions in the suit. E.g., *Carris v. Marriott International Inc.*, 466 F.3d 558, 560 (7th Cir. 2006) (Illinois law) (describing *lex loci delicti* as the "default rule" of choice of law in tort cases even in jurisdictions that have embraced "most significant relationship" or other alternative choice of law rules); *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844-45 (7th Cir. 1999) (same); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002) (Indiana law). And the place where the tort occurred is where the injury occurred, which in the present cases was Argentina, rather than where the conduct (in this case the manufacture of the clotting protein) that caused the injury occurred; for "there is no tort without an injury." *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 156 (7th Cir. 1996).

As we explained in the *Spinozzi* case, "in the absence of unusual circumstances, the highest scorer on the 'most significant relationship' test is—the place where the tort occurred. For that is the place that has the greatest interest in striking a reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law." 174 F.3d at 844-45. That is particularly true when the place of the

accident is also the place in which the victims were injured and were resident, for that offsets the argument that the jurisdiction of the defendant has an interest in regulating the conduct of its people and firms. Victim location and injurer location are valid considerations. But when they point to two different jurisdictions they cancel out, leaving the place where the injury (and hence the tort) occurred as the presumptive source of the law governing the accident. So if these cases were to be tried in American courts, in all likelihood the law of Argentina would govern the substantive issues.

And if instead the cases are tried in Argentina? Argentina is a civil law country, and its law is heavily influenced by the law of other civil law countries, especially the law of France and of Spain and more especially the Napoleonic Code, which remains the basis of Spanish as well as French law. Mary Ann Glendon, Paolo G. Carozza & Colin B. Picker, *Comparative Legal Traditions in a Nutshell* § 11, p. 46 (3d ed. 2008); Andrew J. McClurg, Adem Koyuncu & Luis Eduardo Sprovieri, *Practical Global Tort Litigation: United States, Germany and Argentina* 37 (2007); Lisandro A. Allende & Enrique Schinelli Casares, "Product Liability in Argentina: Ten Years of the Consumer Protection Law," *Liability for Products in a Global Economy* 1, 2 (Spec. Issue 2004). Article 3 of the Napoleonic Code has been interpreted as adopting *lex loci delicti*. 1 H. Batiffol & P. Lagarde, *Droit international privé* 321-36 (7th ed. 1981); Symeon Symeonides, "Louisiana's New Law of Choice of Law for Tort Conflicts: An Exegesis," 66 *Tulane L. Rev.* 677, 680 n. 13 (1992); Symeonides, "Exploring the 'Dismal Swamp': The Revision of Louisiana's Conflicts

Law on Successions," 47 *La. L. Rev.* 1029, 1104 (1987). That is also the choice of law rule in Spain. Diego P. Fernández Arroyo, Miguel Checa Martínez & Pilar Maestre Casas, "Spain," *Private International Law—Supp. 18*, p. 52 (Aug. 2008).

So an Argentine court would probably apply Argentine law in this case, since Argentina is the place in which the plaintiffs, who are residents of that nation, were injured as a consequence of the defendants' alleged wrongful conduct. See also Werner Goldschmidt, "Argentina: Draft Code of Private International Law" art. 34, 24 I.L.M. 269, 281, 1985 WL 204573 (Mar. 1985). It is true that the district judge in *Abad* predicted that an Argentine court would apply U.S. law rather than Argentine law (on what basis is unclear); that, as just explained, we dis-agree with him; and that an error of law can vitiate a discretionary judgment. But not if correcting the error reinforces the judgment, as it does here, by rehabilitating an argument in favor of the judge's result that he rejected.

The superior competence of the Argentine courts to decide the merits of *Abad* is especially great because of the dearth of Argentine legal materials relating to the critical question of what the parties call "alternative causation theories" but is more informatively called the "market share" approach to tort causation. As in the DES cases in the United States, e.g., *Sindell v. Abbot Labora-tories*, 607 P.2d 924 (Cal. 1980), the plaintiffs do not know which blood-solids manufacturer or manufacturers made the blood solids that they took. In such a case an attractive approximation to the responsibility of each

manufacturer who might have been the supplier of the blood solids to the plaintiff is the manufacturer's share of the relevant market for those blood solids; and the relevant market is Argentina.

We cannot be sure that the Argentine courts would impose market-share liability. But causation is generally treated similarly by U.S. and Argentine courts, McClurg, Koyuncu & Sprovieri, *supra*, at 98. And Maria Morena del Rio & Cecilia Victoria, "Argentina," *International Comparative Legal Guide: Product Liability 2008* § 2.3 (Global Legal Group 2008), p. 68, www.iclg.co.uk/Khadmin/ Publications/pdf/2115.pdf (visited Apr. 22, 2009), state that Argentine courts would either apply such an approach, or, what would be even better from a plaintiff's standpoint, impose joint and several liability on all producers who might have supplied the defective product to the plaintiff. But whether those courts would recognize either approach does not bear on whether to keep the litigation in the United States, since, as we said, an American court would apply the tort law of Argentina, including of course its causal principles. Rather, the uncertainty of Argentine law is a compelling reason why this case should be litigated in Argentina rather than in the United States. When the decision of a case is uncertain because the orthodox sources of law do not provide adequate guidance (apparently no code provision or judicial decision in Argentina accepts or rejects market-share liability), the court asked to decide must make law, in this case Argentine law; and an Argentine court is the more competent maker of Argentine law—more competent in the sense of more legitimate, but also

more competent in the sense of being better able to decide the case correctly because more at home in the relevant legal tradition than an American court would be.

*Pastor*, our second case, is a wrongful-death suit growing out of a fatal auto accident in Argentina when a Ford Explorer, an SUV equipped with tires manufactured by Bridgestone/Firestone, rolled over. The suit, originally filed in a state court in Florida and removed to a federal district court there, charges the defendants with defects in the design, manufacture, and testing of the vehicle and its tires. The suit, one of a number of similar suits, was sent by the Multidistrict Litigation Panel to the federal district court in Indianapolis for pretrial discovery, but it will return to Florida for trial if we reverse the dismissal.

There is no issue of "alternative causation theories" in this rather routine products-liability case, although some uncertainty remains about Argentine tort law because, so far as we can determine, the civil code and judicial decisions in Argentina do not address many of the issues that can arise in an accident case. The district judge correctly ruled that the law applicable to the suit *is* Argentine law, and, other things being equal, an Argentine court is, as we said, more competent than an American court to apply Argentine law, and, *a fortiori*, to create it, which may be necessary, though this is less likely in *Pastor* than in *Abad*.

The plaintiffs point out that the district court was required to apply the choice of law rules of the state in which the suit was originally filed. *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992); *In re*

*Air Disaster at Ramstein Air Base*, 81 F.3d 570, 576 (5th Cir. 1996). That is Florida, and they argue that a Florida court would select the tort law of Florida, not of Argentina, to govern those issues. But the rule in Florida is *lex loci delicti*, *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980); *Connell v. Riggins*, 944 So. 2d 1174, 1176-77 (Fla. App. 2006); *Barron v. Ford Motor Co. of Canada, Ltd.*, *supra*, 965 F.2d at 197-98 (Florida law), unless there are special circumstances, as in the cases the plaintiffs cite, such as *Crowell v. Clay Hyder Trucking Lines, Inc.*, 700 So. 2d 120 (Fla. App. 1997). That case arose from a hit-and-run accident in Georgia between citizens of Florida. The question was whether the truck that collided with the plaintiff's car was owned by the defendant, in which event the defendant would be liable for the driver's negligence in accordance with the doctrine of respondeat superior. The court sensibly ruled that the question of ownership should be answered by reference to Florida law. For it was a question of agency law, and if the defendant was indeed the owner this meant that both agent and principal, along with the plaintiff, were Floridians.

   *Proprietors Ins. Co. v. Valsecchi*, 435 So. 2d 290 (Fla. App. 1983), also relied on by the plaintiffs, is also remote from our case. A plane crashed in mid-flight and the estates of the passengers sued the pilot and owners of the plane. The place of the crash had nothing to do with the accident or the plaintiffs. In another case cited by the plaintiffs, the law of the place of the accident was not applied because it was repugnant to Florida law. *Futch v. Ryder Truck Rental, Inc.*, 391 So. 2d 808 (Fla. App. 1980). These cases illustrate that in American courts *lex loci delicti* is

merely a practical presumption, and not a rule, but a presumption that appears to be applicable to this case.

The plaintiffs have collected a mass of documentary material relating to the design of the Ford car and Bridgestone tires that they contend was negligent, and some of those documents would have to be translated into Spanish if the trial is held in Argentina. Because *Pastor* is not a class action and there are no exotic issues of causation, the amount of discovery to be conducted in Argentina will be limited. But it will not be trivial; nor will it, as the plaintiffs suggest, be limited to medical records. The defendants intend to present evidence that the accident was caused by factors other than the design or manufacture of the vehicle or of its tires, such as poor maintenance in Argentina, where the vehicle was purchased from an automobile dealer. Much of this evidence, moreover, will come from third parties in Argentina, who cannot be compelled to testify in the United States; this weighs in favor of the dismissal.

And while the plaintiffs probably are right that their translation burden will be greater if the case is litigated in Argentina than the defendants' would be if the case remained in the United States, we cannot determine how much greater because they have not indicated the cost. The figure of $4 to $5 million that they press on us has not been substantiated, and their statement that "it is tremendously significant" that the SUV itself, described extravagantly as "perhaps the single most critical piece of evidence" in the case, is at present in Chicago and would have to be shipped back to Argentina for the trial,

is desperate. The vehicle is unlikely to be dragged into the courtroom for inspection by the judge (there is no civil jury in Argentina, McClurg, Koyuncu & Sprovieri, *supra*, at 76-77, 81), and the plaintiffs present no evidence that shipping even a damaged vehicle from Illinois to Argentina would be costly; think of the millions of vehicles manufactured abroad that are competitive in the United States market despite the shipping cost.

The plaintiffs further argue that court congestion is worse in Argentina than in the United States. But they rely for that argument on delay in suits litigated decades ago and do not explain why they failed to obtain up-to-date information about court congestion in Argentina.

In support of the district judge's order we note that the case will not remain in Indianapolis in any event; it will go to Florida for trial if it does not go to Argentina. Proceedings in two courts would not be avoided even if we reversed the order dismissing the suit.

In neither case did the judge abuse his or her discretion, and therefore the judgments are

AFFIRMED.